UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

FRESH START CENTER,

          Plaintiff(s),

                            Case No.  24-cv-12140

vs.

                            HON. GERSHWIN A. DRAIN

TOWNSHIP OF GROSSE ILE,

          Defendant(s).

## OPINION AND ORDER DENYING MOTION FOR PRELIMINARY INJUNCTION [#5]

### I.   INTRODUCTION

Plaintiff, Fresh Start Center (the "Center"), filed this action against the Township of Grosse Ile, alleging the Township has violated the First Amendment's Free Exercise Clause and the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. § 2000cc ("RLUIPA") by denying the Center's request for a special land use to operate its religious retreats at the Center's Property, which is located in a Township district primarily zoned for single-family residences.

Now before the Court is the Center's Motion for Preliminary Injunction, filed on August 16, 2024.  The Center limits its present motion to its RLUIPA claims only.  The Township filed a Response on August 22, 2024, and the Center filed a Reply on August 23, 2024.  A hearing was held on August 29, 2024.  For

the reasons that follow, the Court denies the Center's Motion for Preliminary
Injunction.

## II.     FACTUAL BACKGROUND

### A.  The Township's Zoning Ordinance

Grose Ile Township has adopted a Zoning Ordinance ("ZO"), found in
Chapter 285 of the Grosse Ile Code of Ordinances. *See* Grosse Ile Township
Ordinance, § 285 *et seq*.  The ZO divides Grosse Ile Township into districts and
creates regulations governing land development within those districts.  *Id*., § 285-
2.1.  Article 3 of Chapter 285 sets forth the regulations for all single-family
residential districts.  *Id*., Article 3.1-3.5.  The Property is located in a district zoned
R-1-B, Single-Family Residential.  ECF No. 1, PageID.6.  Chapter 285-3.1 states
that single-family residential districts, including the R-1-B district, are intended to
provide for "a residential environment consisting of predominantly low-density,
single-family dwelling units, with a limited range of other uses that are considered
necessary or appropriate to enhance the quality of life within Grosse Ile's
residential neighborhoods.  *Id*., § 285-3.1.  Chapter 285-3.1 states that the
regulations governing single-family residential districts are intended to:

    a.  Provide a high-quality residential living environment which
        encourages safety and enhancement of property values;
    b.  Protect open areas, shorelines, woodlands, wetlands; and other
        distinctive natural features that contribute to the overall quality of
        life on Grosse Ile;

    c.  Ensure development is in accordance with the availability of public utilities, facilities, and services;

    d.  Prevent overcrowding by establishing standards for density, minimum lot sizes and minimum yard dimensions;

    e.  Protect residential areas by promoting traffic volumes and speeds consistent with the neighborhood character based on a hierarchy of street functional classification;

    f.  Discourage development which is inconsistent with the quality and design of existing residential neighborhoods;

    g.  Accommodate care facilities that are single-family residential in character while avoiding an excessive concentration of these facilities within the single-family districts; and

    h.  Ensure infill development is consistent with the character of established neighborhoods, is compatible with the size, scale, setback, and architectural character of surrounding homes, does not overbuild small lots, minimizes impacts to views, privacy, and access to sunlight and contributes to the distinct, cohesive character in the various neighborhoods, which are significant factors in the Township's quality of life.

*Id.*, § 285-3.1.  Principal permitted uses in single-family residential districts,

including R-1-B, include:

    (1)  Single-family detached dwelling units meeting the residential design standards of § 285-3.4E.  Single-family subdivisions and site condominium projects must also comply with Municipal Code requirements including Chapter 238, Subdivision Control, and Chapter 71, Condominium Projects, as appropriate.

    (2)  Essential services not including buildings or storage yards, when operating requirements necessitate their location within the district to serve the immediate vicinity as determined by the Planning Commission.

    (3) Land designated as public parks public open space, bike paths and lands designated for preservation as part of the natural drainage system.

    (4) State-licensed adult foster care family home in a single-family residence (six or fewer adults).

3

> (5) State-licensed adult foster care family home in a single-family residence (six or fewer adults; foster care five or more days per week.
> (6) Family day care (one to six children, less than 24 hours' care).
> (7) Foster family home (one to four children, 24 hours' care).

*Id.*, § 285-3.3.

Article 3 also identifies a number of uses that are allowed by special land use permit in the single-family residential districts, subject to the standards and approval requirements set forth in Article 22, Special Land Use Review. *Id.*, § 285-3.3C. In the R-1-B single-family residential district, the following land uses are permitted subject to approval: schools, churches,[1] child-care centers or day-care centers, golf clubs, boat clubs, cemeteries, public utility buildings, adult foster care small group (7 to 12 adults), group day-care (7 to 12 unrelated children/private residence). Each of the possible special land uses has a number of additional conditions that must be satisfied, including a minimum of 40 foot setbacks (schools, churches, child-care/day-care centers), direct access to a collector, arterial or paved public road (schools, churches, child-care/day-care centers, cemeteries), and minimum road frontage (child-care/day-care centers), screening requirements (schools, churches, child-care/day-care centers, cemeteries, boat clubs), among other requirements. *Id.*, § 285-3.3C(1).

---

[1] "Church" is broadly defined in the Township Zoning Ordinance as "any structure wherein persons regularly assemble for religious activity." § 285-1.3.

Article 7 of the ZO governs the Macomb Street District, which allows religious facilities as a matter of right.  *Id*., § 285-7.2.  Currently, there is available property for sale in the Macomb Street District.

**B.  Fresh Start Center**

In October of 2020, Yochannon Polter, President of the Board of Fresh Start Center, and Tzadok Eliyahu, purchased residential property for use as a vacation home in the Township.  ECF No. 1, PageID.5.  In early 2021, the Center[2] began holding religious retreats to help individuals of the Orthodox Jewish faith who have experienced religious and other trauma resulting in the loss of faith in or feeling resentment or bitterness towards God.  The Center's mission is to restore these individuals' relationship and belief in God.  *Id*., PageID.3.  The Center believes a core tenant of Judaism is to help those adherents who have fallen in their faith to heal their relationship with God.  *Id*.  The Center's mission is in furtherance of this sincerely held belief.  *Id*.

The Center holds retreats twice a month at the Property, one for males and one for females.  *Id*., PageID.4.  The retreats last for one week.  *Id*.  Each retreat consists of 4 to 5 participants, who come from all over the world.  *Id*.  In addition to the participants, there can be up to 2 to 4 other individuals at the Property.  *Id*.

---

[2] The record is devoid of facts explaining under what authority the Center operates on the Property.  However, at the hearing, the Center advised that it has a lease agreement to operate its retreats at the Property.

One is a facilitator; one is a rabbi and up to two additional support staff.  *Id*.  The

Center screens the participants by having prospective participants complete a

rigorous questionnaire and thorough screening calls and discussions.  *Id*.

Individuals either stay at local hotels or stay at the Property.  *Id*., PageID.5.  The

Center denies prescribing or administering medical care or medications.  *Id*.  Nor

does the Center offer out-patient treatment for drug, alcohol, sexual addiction, or

mental illnesses.  *Id*.

### C.  Fresh Start Center's Special Land Use Request

On January 30, 2023, a participant at the Center wished to leave the retreat

and likely misunderstood where she was supposed to be picked up by her sister.

*Id*., PageID.8.  A resident called the Township Police Department indicating there

was a woman in "pilgrimage garb" hiding along the side of the resident's home.

ECF No. 9, PageID.278.  The police picked up the participant and returned her to

the Property.  ECF No. 1, PageID.8.  The woman informed the police that she had

been staying in a "temporary house" called Fresh Start.  ECF No. 9, PageID.278.

On February 2, 2023, Ross Querro, the Community & Economic

Development/Downtown Development Authority Director, made a business

license inquiry to the Michigan Department of Licensing and Regulatory Affairs

("LARA") as to whether the Center was an unlicensed adult foster care facility.

ECF No. 1, PageID.8.  Following an investigation, LARA determined that the Center was not an unlicensed adult foster care facility.  *Id*.

The Township reviewed Fresh Start's website to learn more about the Center. ECF No. 9, PageID.278.  Fresh Start's website indicated that the Property was being used as a retreat center, providing therapy for "emotional and mental health struggles, originating from unresolved childhood issues, trauma, abuse, and more" by hosting intensive 7-day retreats "developed under the guidance and leadership of a team of world-renowned trauma experts, licensed clinical therapists, doctors and rabbonim . . . ."  *Id*.  The Fresh Start retreats are offered at a "subsidized" price of $6,995.00. *Id*.

On March 13, 2023, the Township's counsel sent Mr. Polter and Mr. Eliyahu a letter demanding that they cease using the Property as a trauma retreat center. *Id*., PageID.9, 59.  On May 17, 2023, counsel for Plaintiff met with Township staff to discuss resolution of the land use issues concerning the Property.  ECF No. 1, PageID.9.  The Township asserts that it first became aware of a religious use of the Property at this meeting.  ECF No. 9, PageID.283.  After discussing various options to bring the Property into compliance with the Township's ordinances, Plaintiff made the determination to apply for special land use approval to use the Property as a church.  *Id*. The Township agreed that it would not take enforcement action against Plaintiff and would allow retreats to continue, so long as the Center

worked in good faith to resolve the outstanding land use issue. *Id*., ECF No. 1, PageID.9.

On June 6, 2023, the Center submitted its "Pre-Application Meeting Checklist," and a letter informing the Township it is improper for the Township to question the religious exercise of the Center, as it falls within the type of conduct protected by RLUIPA. *Id*. On June 27, 2023, Mr. Querro sent a letter to counsel for the Center indicating the Pre-Application Packet did not include sufficient information to determine whether the Center's proposed use complies with the Township's Zoning Ordinance. ECF No. 1, PageID.81.  On August 18, 2023, the Center's attorney and Township officials discussed the next steps for the Center. *Id*., PageID.9.  Following this meeting, it was determined that the Center would apply for special land use permission to continue use of the Property for religious purposes. *Id*., PageID.10.  The discussion did not indicate that denial of the special land use was likely. *Id.*

On December 18, 2023, the Center submitted its special land use application to the Township. *Id*.  On March 7, 2024, Brian Borden, the Township's City Planner, sent a draft of his special land use and site plan report to Mr. Querro for review. *Id.*  Mr. Querro responded that, "after reviewing this I can't find a situation where the Commission would turn this down." *Id*. The Township issued notice of a public meeting for the Planning Commission to consider the Center's

special land use application.  *Id*. The Township received multiple letters opposing

the special land use. *Id*., PageID.11, 116-119.  Two of the letters explicitly

questioned the religious nature of the Center, highlighting the information found

on the Center's website stating the retreats provide therapy for "emotional and

mental health struggles, originating from unresolved childhood issues, trauma,

abuse, and more" and cost participants $6,995.00.  *Id*.

On March 20, 2024, the Township Planning Commission held a public

hearing on the Center's special land use permit application.  ECF No. 1,

PageID.11.  At the meeting, two Planning Commission members made multiple

comments questioning whether the Center was a religious organization rather than

a for profit business.  *Id*.  This sentiment was echoed in the public comments.  *Id*.

Because the Township's Zoning Ordinance required different setbacks for the

special land use requested, the Township's Zoning Board of Appeals was required

to consider a request for a variance from the setback requirement before the

Planning Commission could act on the Center's special land use application and

site plan.  *See* § 285-22.2.  Thus, no decision on the special land use permit

application was made by the Commission at the March 20, 2024 meeting.

While the Center disagreed with the need for a variance, on April 17, 2024,

the Center applied for a variance regarding the 40-foot setback requirement.  ECF

No. 1, PageID.11. On May 6, 2024, the Planning Commission recommended that

Zoning Board of Appeals deny the Center's variance request.  On May 28, 2024, the Zoning Board of Appeals denied the Center's variance request.  Because the Center could not satisfy the setback requirement, the Township Planning Commission voted to recommend to the Township Board that it deny the Center's special land use application.  *Id.*, PageID.12.  On August 12, 2024, the Board of Trustees voted unanimously to deny Plaintiff's special land use permit application, but for different reasons than the Planning Commission.  The Township based its denial of the application for special land use because it (1) was not compatible with the master plan where the use will not preserve neighborhood character or protect the privacy of the residents and (2) the use is not compatible with adjacent land uses because a fee-based religious retreat and therapy center is a significant departure from the well-established residential use of the property and surrounding properties.  *Id*.

### D. Procedural Posture

Plaintiff filed the instant lawsuit three days later and immediately moved for a temporary restraining order and/or preliminary injunction.  The Court granted the Center's Motion for a Temporary Restraining Order on an *ex parte* basis concluding that the Township's ZO "appears to violate" the substantial burden and equal terms provisions, and therefore irreparable injury is presumed.  ECF No. 6, PageID.257-258.  The Court also set a briefing schedule and a hearing to consider

the Center's Motion for a Preliminary Injunction.  The Temporary Restraining

Order expires on August 30, 2024.

## III.   LAW & ANALYSIS

### A.   Standard of Review

Injunctive relief is "an extraordinary remedy that may only be awarded upon

a clear showing that the plaintiff is entitled to such relief."  *Winter v. Nat. Res. Def.*

*Council, Inc*., 555 U.S. 7, 22 (2008).  In considering whether to grant injunctive

relief, courts consider the following four factors:  "(1) whether the movant has a

strong likelihood of success on the merits; (2) whether the movant would suffer

irreparable injury without the injunction; (3) whether issuance of the injunction

would cause substantial harm to others; and (4) whether the public interest would

be served by the issuance of the injunction."  *Certified Restoration Dry Cleaning*

*Network, LLC v. Tenke Corp*., 511 F.3d 535, 542 (6th Cir. 2007) (citation omitted).

"In RLUIPA cases–as in other cases involving free-exercise rights–the likelihood

of success on the merits is often the dispositive factor."  *Catholic Healthcare Int'l,*

*Inc. v. Genoa Charter Twp*., 82 F.4th 442, 447 (6th Cir. 2023*); see also Gonzales*

*v. Nat. Bd. Of Med. Exam'rs*, 225 F.3d 620, 625 (6th Cir. 2000).  The party seeking

the injunction must establish its case by clear and convincing evidence. *See*

*Garlock, Inc. v. United Seal, Inc.*, 404 F.2d 256, 257 (6th Cir. 1968).

**B.  Likelihood of Success on the Merits**

**1.  Substantial Burden**

RLUIPA provides in relevant part:

> No government shall impose or implement a land use regulation in a
> manner that imposes a substantial burden on the religious exercise of
> a person, including a religious assembly or institution, unless the
> government demonstrates that imposition of the burden on that
> person, assembly or institution–
> (A) is in furtherance of a compelling governmental interest; and
> (B) is the least restrictive means of furthering that compelling
> governmental interest.

42 U.S.C. § 20000cc(a)(1).  A burden is "substantial" if it has "some degree of

severity" and is "more than an inconvenience."  *Catholic Healthcare*, 82 F.4th at

448.  "[T]aking seriously the requirement that a burden be 'substantial' is

necessary in order to avoid an interpretation of RLUIPA that would exempt

religious institutions from all land-use regulations."  *Livingston Christian Schs. v.

Genoa Charter Township*, 858 F.3d 996, 1003 (6th Cir. 2017) (citing *Living Water

Church of God v. Charter Twp. of Meridian*, 258 F. App'x 729, 736 (6th Cir.

2007)).  A religious institution can show a substantial burden by demonstrating that

(1) it has no "feasible alternative location from which it can carry on its mission;"

(2) it has or "will suffer substantial delay, uncertainty, and expense due to the

imposition of the regulation," and (3) it did not impose the burden upon itself.

*Livingston Christian Schs.*, 858 F.3d at 1004.

The Center argues that the denial of its variance and special land use applications has substantially burdened the Center's right to practice its sincerely held religious beliefs.  The Center argues that it has no feasible alternative location for its religious retreats.  The Center asserts that it has been unable to identify any alternate location in the Township which is available and properly zoned for the Center's religious activity.  The Center explains that there are lengthy kosher requirements that must be met for preparing foods in the kitchen.

As an initial matter, it appears the Center misrepresents that there is no available alternate location in the Township to hold its retreats.  At the hearing, the Township asserted that there is vacant property located in the Township's Macomb Street district, which allows places of worship as of right.  In any event, the unavailability of land in the particular jurisdiction "will not by itself support a substantial burden claim."  *Andon, LLV v. City of Newport News, VA*, 813 f.3d 510, 515 (4th Cir. 2016); *Civil Liberties for Urban Believers (CLUB) v. City of Chicago*, 342 F.3d 752, 761 (7th Cir. 2003) (a land use regulation does not impose a substantial burden simply because of a lack of affordable land in Chicago or for other reasons, because such unavailability may be the result of competitive real estate markets and not the municipality's actions).

In *Livingston Christian Schs.*, the court concluded the plaintiff Christian school "was not substantially burdened within the meaning of RLUIPA despite the

alleged unavailability of other land within Genoa Township." 858 F.3d at 1011.

The court noted that the school's stated mission "is to serve Livingston County as a

whole, not Genoa Township in particular." *Id.* In this case, the Center's stated

mission is to help individuals of the Orthodox Jewish faith restore their

relationship with God. The Center seeks to serve such individuals from all over

the world, not just individuals residing in the Township. The *Livingston Christian*

*Schs.* court explained that:

> Holding that a religious institution is substantially burdened any time
> that it cannot locate within such a small area—even if it could locate
> just across the border of the town limits—would be tantamount to
> giving religious institutions a free pass from zoning laws.

*Id.* The court also noted that Genoa Township comprises an area of only

36.3 square miles. Grosse Ile is significantly smaller, with a land area of

only 9.03 miles.

Here, the Center provides no specific facts that support its allegations that it

has no feasible location from which to carry out its religious exercise. Plaintiff

does not allege there is a large Orthodox Jewish community residing on Grosse Ile

that requires convenient access to Plaintiff's retreats. The Complaint alleges that

retreat participants come from "all over the world." Plaintiff has not come forward

with any facts demonstrating why it is critical that its retreats be held in a single-

family residential district in the Township. This is unlike *United States v. City of*

*Troy*, which Plaintiff relies upon in support of its argument. 592 F. Supp.3d 591 (E.D. Mich. 2022).

In *Troy*, the Adam Community Center sought to use property in the city that would be suitable to serve its 200 families. *Id*. at 599. The Court rejected Troy's argument that there were other feasible alternate locations just outside the city because the plaintiff needed "a convenient central location in Troy due to Islam's requirement of five daily prayers" and "[d]riving long distances to other communities five times a day is impractical and unnecessary." *Id*. at 609. Here, Plaintiff's retreat participants come from all over the world to attend a seven-day retreat. Plaintiff does not claim that Grosse Ile, or the Property holds religious significance such that its retreats must occur in the Township.

Next, Plaintiff asserts that it has incurred substantial delay and expended significant money through the special land use and variance application process. However, the only costs referenced in the Complaint are the costs associated with the special land use and variance applications, costs that any property owner would pay when seeking a special land use approval. The Center relies on *Catholic Healthcare Int'l, Inc. v. Genoa Charter Twp*., 82 F.4th 442, 447 (6th Cir. 2023) in support of its claim; however, in that case the plaintiff had expended $38,000.00 in application fees for its special land use request and had been waiting for more than two years for the administrative proceedings to be completed. At the hearing, the

Center represented that it has expended thousands of dollars and waited one and a half years for the special land use proceedings to conclude.   However, in this case, the Center was allowed to continue its retreats at the Property during the pendency of the administrative proceedings.  This is unlike *Catholic Healthcare*, where the plaintiff was not permitted to restore its religious displays to its prayer trail during the pendency of the special land use proceedings.  82 F. 4th at 446.

When determining whether a municipality's zoning laws substantially burden a person's exercise of religion, courts also look to whether the burden on the plaintiff was self-imposed.  The Center argues it had a reasonable expectation that its application would be granted, particularly given Mr. Querro's comment to Mr. Borden that there appeared to be no conceivable land use reason for denial. The Center also argues it was not unreasonable to believe its retreats would be allowed to operate as of right in a zoning district which allows the much more intrusive adult foster homes to operate as of right.

Plaintiff relies on the Sixth Circuit's decision in *Catholic Healthcare*, *Int'l, Inc. v. Genoa Charter Twp.*, where Genoa Charter Township treated the plaintiffs' prayer trail as the zoning equivalent of a church building requiring the plaintiffs to apply for a special land use.  82 F.4th 442, 444 (6th Cir. 2023).  In rejecting Genoa Township's argument that the plaintiffs had imposed the burden upon themselves, the *Catholic Healthcare* court noted that Genoa Township's Fillmore County Park

included a fifteen station "Leopold the Lion Reading Trail." *Id*. at 444-45.  The

court held that:

> Plaintiffs had reason to think that their prayer trail would be
> treated in the same manner as '[p]rivate non-commercial parks, nature
> preserves and recreational areas—none of which require a special
> land-use permit in the type of zoning district in which plaintiff's
> parcel is located.
>
> *                    *                    *
>
> The Township's demand that the plaintiffs obtain a special
> land-use permit for the religious displays on their trail . . . came as a
> shock to these plaintiffs precisely because nothing in the Township's
> ordinance prepared them for it.

*Id*. at 449-50.

Conversely, in this case, the Property was not purchased with the intent to

hold religious retreats, but rather as a vacation home.  It is not reasonable for the

Center to conclude that it could conform its residential use of the Property to a

special land use of holding religious retreats.  An adult foster care home is a place

where adults with disabilities live and are provided with care—a use consistent

with residentially-zoned property.

Finally, the Center complains that during the special land use proceedings,

members of the public and members of the Planning Commission allegedly made

discriminatory comments about the Center.  However, whether there is evidence

that a municipality's decision-making process was arbitrary, capricious, or

discriminatory is not relevant to the substantial burden inquiry in the Sixth Circuit.

*See Livingston Christian Schs*., 858 F.3d at 1004-05 ("Evidence of improper

decision-making is more appropriately considered when evaluating whether a government action was narrowly tailored to serve a state interest–an inquiry that the court should undertake only after finding that a substantial burden exists.") (citing *Living Water Church of God*, 258 F. App'x at 741).

Because Plaintiff has not demonstrated a strong likelihood of establishing a substantial burden on the Center's religious exercise, the Court need not determine whether that substantial burden was the least restrictive means of furthering a compelling government interest.  42 U.S.C. § 2000cc-1(a).  Here, the Center has not shown there are no feasible alternate locations within the Township and outside the Township where the Center can conduct its retreats.  The only burden the Center has demonstrated is disappointment that it cannot conduct its retreats at the Property.   The present record reveals that being unable to conduct its retreats at a desired location does not rise to the level of a substantial burden.  While the Center may ultimately succeed on the merits once the record is more fully developed, at this juncture it has not shown a strong likelihood of success on the merits of its substantial burden RLUIPA claim.

### 2.   Equal Terms

Plaintiff also alleges that the Township's ZO violates RLUIPA's equal terms provision.  Under RLUIPA's equal terms provision, localities are forbidden from "impos[ing] or implement[ing] a land use regulation in a manner that treats a

religious assembly or institution on less than equal terms with a nonreligious assembly or institution."  42 U.S.C. § 2000cc(b)(1).  In order to establish a prima facie case under RLUIPA's equal terms provision, the plaintiff must demonstrate the following:  "(1) the plaintiff [is] a religious assembly or institution, (2) subject to a land use regulation, that (3) treats the [plaintiff] on less than equal terms, [compared] with (4) a nonreligious assembly or institution." *Tree of Life Christian Schs. v. City of Upper Arlington,* 905 F.3d 357, 367 (6th Cir. 2018).

Plaintiff argues that because state-licensed adult foster care family homes are permitted in the R-1-B zoning district as of right and churches are subject to special land use approval, the Township's ZO violates the equal terms provision. As an initial matter, the Michigan Zoning Enabling Act requires that an adult care foster care family home be a principal permitted use in all residential zoning districts.  *See* MICH. COMP. LAWS § 125.3206(1).

Moreover, unlike Plaintiff's proposed religious use, an adult foster care family home is a residential use, defined under state law as a home or facility that provides "foster care" for adults.  "Foster care" is defined as "the provision of supervision, personal care, and protection in addition to room and board, for 24 hours a day, 5 or more days a week, and for 2 or more consecutive weeks for compensation provided at a single address." MICH. COMP. LAWS § 400.704(8).

Thus, adult foster care is a place where adults with disabilities live and are provided with care, a use consistent with residentially zoned property.

Additionally, the Center cannot establish that the ZO treats its proposed religious use of the Property on less than equal terms with other nonreligious assembly uses. In *City of Troy*, the Court concluded the city's zoning ordinance treated places of worship on less than equal terms than similarly situated nonreligious assemblies and institutions. 592 F. Supp. 3d at 606. Specifically, the *City of Troy* court found the following:

> [I]n the General Business district, a nonreligious community center (or banquet hall, funeral home, theatre, etc.) could operate by right from a building meeting general setback standards . . . without a variance. But because ZO § 6.21 imposes a 50-foot setback standard on places of worship, a religious entity, regardless of size, would need variances for all sides. If that building abutted a single-family home with a 75-foot setback, the community center could have parking as close as 10 feet from the property line. But a religious entity would need a variance to have parking within 50 feet of the property line.

*Id.* Thus, in *City of Troy*, the zoning ordinance imposed additional burdens on places of worship compared with non-religious, assemblies and institutions.

This is unlike the Township's ZO. The R-1-B zoning district authorizes other potential special uses, including schools, child-care or day-care centers, golf clubs, boat clubs, cemeteries, public utility buildings, adult foster care small group homes (7 to 12 adults) and group day care centers.

Except for adult foster care small group homes and cemeteries, every other special land use is a nonreligious, assembly use similar to a church. All of these special land uses have additional conditions that must be satisfied in order to be considered for approval, including the 40-foot setback requirement that was applied to the Plaintiff.  Day cares and cemeteries must satisfy a longer list of conditions than churches in order to obtain special land use approval in single-family residential zoning districts in the Township.  As such, Plaintiff also cannot establish a strong likelihood of success on the merits of its RLUIPA equal terms claim.

### C.  Irreparable Harm

The Center argues that it will suffer irreparable harm if a preliminary injunction is not entered because it will be required to cease its bi-weekly retreats in conformity with its sincerely held religious beliefs.  The Center further argues that a preliminary injunction will preserve the status quo during the pendency of this action.

Here, on this more fully developed record, the Court cannot conclude the presumption of irreparable harm applies where Plaintiff cannot demonstrate a strong likelihood of success on the merits.  *See Roe v. Univ. of Cincinnati*, No. 1:18-cv-312, 2018 U.S. Dist. LEXIS 226425 (S.D. Ohio Aug. 21, 2018)(when the plaintiff fails to demonstrate a likelihood of success on her constitutional claims,

no presumption of irreparable harm is warranted); *Schrier v. Univ. of Colorado*, 427 F.3d 1253, 1266 (10th Cir. 2005)(noting that "the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury" but finding that the presumption does not apply unless the requisite likelihood of success of the claim is established") (internal quotation marks and citation omitted).

Plaintiff has provided no facts that show its retreats must occur at the Property.  There are no allegations suggesting that only the Property is capable of hosting retreats as opposed to another location.  Unlike a synagogue, which must be located such that observant worshippers are able to walk to participate in services, all of the Center's retreat participants travel from all over the world to access its services.  While Plaintiff asserts the status quo must be maintained, Plaintiff incorrectly asserts the status quo is allowing the Center to continue its unauthorized use of the Property in violation of the Township ZO.

This factor does not weigh in favor of granting a preliminary injunction.

**D.  Public Interest and Balance of Harms**

The final factors also weigh in favor of denying the Center's request for a preliminary injunction.  Plaintiff cannot show it is in the public interest for the Court to prohibit the Township from enforcing its ZO or to overturn the decision of the Township Board of Trustees to deny Plaintiff's special land use.  If the Court

were to allow an unpermitted use of the Property during the pendency of this lawsuit, this would undermine the Township's power to zone in the best interest of its residents.

## V.     CONCLUSION

Considering the four factors, the Court finds that Plaintiff has failed to meet its burden of establishing by clear and convincing evidence its entitlement to a preliminary injunction.  A preliminary injunction is an extraordinary remedy which should be granted only where the circumstances clearly demand it.  Here, Plaintiff has not shown that it has a strong likelihood of success on the merits, or that it will suffer irreparable harm absent an injunction.  Nor has Plaintiff shown the other factors warrant entry of a preliminary injunction.  Accordingly, Plaintiff's Motion for a Preliminary Injunction [#5] is DENIED.

Defendant shall file its Answer no later than September 12, 2024.

SO ORDERED.

Dated:  September 5, 2024                        /s/Gershwin A. Drain
                                                GERSHWIN A. DRAIN
                                                United States District Judge


CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on
September 5, 2024, by electronic and/or ordinary mail.
/s/ Marlena Williams
Case Manager